960 A.2d 1215

Tracy Wendell ADAMS

v.

STATE of Maryland.

No. 2292 Sept.Term, 2006.

Court of Special Appeals of Maryland.

Dec. 2, 2008.

George E. Burns, Jr. (Nancy S. Forster, Public Defender, on the brief), Baltimore, MD, for Appellant.

Brenda Gruss (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellee.

Panel: HOLLANDER,* MARY ELLEN BARBERA,** and J. FREDERICK SHARER, JJ.

J. FREDERICK SHARER, Judge.

Tracy Wendell Adams was convicted of possession of cocaine and distribution of cocaine by a jury in the Circuit Court

---

* Barbera, Mary Ellen, now a member of the Court of Appeals, participated in the hearing and conference of this case while an active member of this Court; and in the adoption of this opinion as a specially assigned member of this Court.

** Sharer, J. Frederick, participated in the hearing and conference of this case while an active member of this Court; he participated in the adoption of this opinion as a retired, specially assigned member of this Court.

for Wicomico County. He was sentenced to a term of 20 years incarceration.

Appellant presents three questions on appeal:

I. Did the trial court err in altering the order of calling jurors?

II. Did the trial court err in refusing the jury's request to review the tape of the alleged transaction?

III. Did the trial court err in granting the State's motion to quash a defense subpoena?

For the following reasons, we shall affirm.

### FACTS

At approximately 5:15 p.m. on September 21, 2005, Salisbury Police Officer Howard Drewer was working undercover, targeting drug sellers. He was alone in an unmarked van equipped with a camera that recorded from the driver's side window. The vehicle was also equipped with an audio device located atop the driver's side sun visor. As Drewer approached a residence at 671 West Main Street, he saw "numerous individuals standing in the front yard," and Drewer was waved down by a black male. Drewer leaned out the van's window and, in response to the man's question, responded that he wanted to buy "a 20," meaning $20 worth of crack cocaine. The man told Drewer to drive around the block and return; he did so, returning in approximately 30 to 45 seconds. When he arrived again at the location, a different black male approached the passenger side door and "pulled out a piece of crack cocaine." Drewer told the man to go to the driver's side, but the man opened the passenger door instead. After Drewer repeated that he wanted to buy "a 20," the man bit off a portion of a piece of crack cocaine and gave it to Drewer. Drewer gave the man $20 in return.

After Drewer drove away, he transmitted a description of the man who sold him the cocaine, and the clothing the man was wearing, to officers in a nearby vehicle, and told them the location where the exchange had taken place. At trial, Drew-

er testified that his description was of a "black male wearing a white tank top shirt, a black baseball cap which he was wearing backward, blue jean shorts and a small or light beard." Drewer testified that he had not seen anyone else in front of the residence at 671 West Main Street similarly dressed.

Drewer was questioned about his handling and processing of the contraband. He described his normal procedure for maintaining purchased contraband:

> Once I obtain it, I have envelopes, small manila envelopes that I place the crack cocaine into that bag. I write on the envelope the location, the time, and a description of the suspect for purpose of my notes so at a later point when we actually type it into the computer I'll have a set of notes referring back to where it had taken place.

Drewer testified that, following his usual procedure, he packaged the crack cocaine into a small envelope that he placed into a larger manila envelope. He folded over the flap on the larger manila envelope and placed it in the pocket of the van door. Drewer further stated that the envelope "is normally stapled into the inside of my manila folder however, it was turned in as evidence already." After packaging the cocaine, Drewer drove to a predetermined area to review the video/audio tape.

Within an hour and a half after he left West Main Street, Drewer viewed photographs at a police office in Salisbury, in the presence of Corporal Yankalunas and Officer Ehrisman.[1] The photographs were laid out side by side on a table before Drewer entered the room. After carefully observing the photographs, Drewer selected a photo, which he "immediately recognized to be the suspect that had sold crack cocaine to [him] in front of 671 West Main Street." Drewer told Yankalunas that the person in that photograph had sold him the cocaine, and initialed and dated the space below the photograph. The

---

1. The record does not disclose the first names of Corporal Yankalunas and Officer Ehrisman.

photograph, bearing Drewer's initials and date, was admitted into evidence.

Drewer made an in-court identification of appellant as the person whose photograph he had selected and, in addition, identified appellant as the man who sold him the crack cocaine on West Main Street. Drewer testified that he had "a face to face" view of the seller as he approached the vehicle, a side view as he walked around the vehicle, and again a "face to face" view when he opened the door of the van. Drewer explained that although the videotape captured the conversation, the camera did not record the transaction because appellant was on the passenger side of the vehicle, away from the camera. However, the State admitted the tape into evidence and played it for the jury.

On cross-examination, Drewer confirmed that he did not seal the smaller envelope. Defense counsel elicited that Drewer had not recorded the seller's height, weight, build, age, hair or complexion. Drewer further testified that he did not recall whether he had testified the previous Friday[2] that he had driven around the block before buying the crack cocaine. Defense counsel further elicited that Drewer had made more than one or two drug purchases a day, on a daily basis, during the time in question.

Drewer testified that he wrote out the property sheet at 10:30 on the night of the transaction, and that he then knew appellant's name. He admitted that he wrote the wrong date— September 23, not September 21. On redirect, Drewer conceded that it looked like the date had been changed, but that the incorrect date was a "handwriting mistake" on his part. Drewer explained that he would have sealed the cocaine in a ziplock baggie on the date he seized it. He also testified that the chain of custody sheet attached to the front of the sealed bag bore the date "9–21–05" and that it was placed there when the drugs were put into the bag.

_____

2. Presumably, at the pre-trial suppression hearing.

Officer Edward Fissel was one of the officers receiving a description over the radio from Drewer, while in the area of West Main Street and Delaware Avenue. The description was of "a black male wearing a white tank top shirt, blue jean shorts, black baseball hat with light beard, light facial hair last seen in the area of West Main and Delaware Avenue." Fissel, in uniform and driving a marked police vehicle, arrived at that intersection about three minutes after he received the description, where he saw a black male matching that description. Fissel stopped the man who, at his request, approached and answered his questions. The man told the officer his name was Tracy Wendell Adams. At trial, Fissel identified appellant as the person whom he stopped that day.

Catherine Savage, a Maryland State Police lab forensic scientist, testified that she received the heat-sealed package submitted by the Salisbury Police Department. Upon analysis, she determined that it was cocaine with a net weight of .1 grams.

Additional facts will be set out as needed in our resolution of the questions presented.

## DISCUSSION

### I.—Jury Selection

Appellant complains that the trial court erred in the jury selection process by not starting the calling of the venire from juror number one. After excusing several of the venire for cause, the court began seating the jury. The following occurred:

THE COURT: We'll start with number seven, Carl Cottingham.

[PROSECUTOR]: Acceptable to the State, Your Honor.

[DEFENSE COUNSEL]: Please seat Mr. Cottingham.

THE COURT: Take seat number one, please.

THE CLERK: Joann Darling.

[DEFENSE COUNSEL]: Please seat Ms. Darling.

[PROSECUTOR]: Acceptable to the State, Your Honor.

THE COURT: Number two.

THE CLERK: Paula Davis.

[PROSECUTOR]: Acceptable to the State, Your Honor.

[DEFENSE COUNSEL]: Your Honor, may we approach?

THE COURT: Yes.

(Whereupon, counsel and the Defendant approached the bench and the following occurred at the bench:)

[DEFENSE COUNSEL]: Your Honor, I noticed that you started with number seven, and number six, Reverend Copeland, and my client, if we don't get back to him, my client would like to have an opportunity to have him on the jury.

THE COURT: Well, sorry. Thank you.

After twelve jurors were seated, defense counsel said, "We're satisfied, Your Honor."

### The Rule

Maryland Rule 4–312, as operative at the time of appellant's trial, provided, in pertinent part:

(g) **Designation of List of Qualified Jurors.** Before the exercise of peremptory challenges, the court shall designate from the jury list those jurors who have qualified after examination. The number designated shall be sufficient to provide the number of jurors and alternates to be sworn after allowing for the exercise of peremptory challenges pursuant to Rule 4–313. The court shall at the same time prescribe the order to be followed in selecting the jurors and alternate jurors from the list.

(h) **Impanelling the Jury.** The jurors and any alternates to be impanelled shall be called from the qualified jurors remaining on the list in the order previously designated by the court and shall be sworn. The court shall designate a juror as foreman.

Nothing in the rule requires the trial court to begin the selection of jurors in any particular manner.

Appellant relies on *Spencer v. State*, 20 Md.App. 201, 314 A.2d 727 (1974), in support of his view that the trial court committed reversible error. In *Spencer*, 50 potential jurors, the remaining jurors of three distinct panels, were brought into the courtroom at the same time. When Spencer and the prosecution began to exercise peremptory challenges, they first excused potential jurors from one panel. At that point, the State had used three of its ten peremptory challenges and the defense had used ten of its 20 peremptory challenges. The clerk had called the jurors "in regular order reading from the top of the list to the bottom." *Id.* at 205, 314 A.2d 727.

The clerk then called names from the second panel, again calling the names in order from the top of the list to the bottom. *Id.* at 205–06, 314 A.2d 727. When that list was exhausted, the State had used all its peremptory challenges and Spencer had three remaining. *Id.* at 206, 314 A.2d 727.

The *Spencer* Court described the defendant's situation:

> The tactical prospect then facing [Spencer] was this: He had three peremptory challenges remaining and the State had none. Seat no. 5 in the jury was vacant. The last list of 13 available names was sitting before him. He knew (or thought he knew) the order in which those 13 persons would be called. By exercising or not exercising some or all of his remaining peremptories, the appellant was in a position to select (by not rejecting) any of the next four names on the list to fill seat no. 5. He chose to go for the fourth name on the list. Accordingly, when the first three names on the list were called (and they were called in predictable order), [Spencer] exhausted his 18th, 19th and 20th peremptory challenges.

*Id.* at 206–07, 314 A.2d 727

At that point, after the first two panels were exhausted, neither party had a peremptory challenge remaining. Then,

> [w]ith no explanation or warning, the clerk suddenly departed from the standard operating procedure and jumped over

the next three names on the list, calling the name of the fourth person down the line to fill seat no. 5.

*Id.* at 207, 314 A.2d 727.

Defense counsel immediately complained that he had exercised his peremptory challenges in the expectation that the clerk would continue the customary manner and order of calling names. Counsel asserted that "the Court in all its fairness and justness should instruct the clerk to call the next prospective juror in line." *Id.* at 207, 314 A.2d 727. The trial court overruled the objection. Spencer was convicted and claimed on appeal that the clerk's deviation impaired his right to use his peremptory challenges. This Court agreed:

> Under the peculiar circumstances of the case at bar, we see a violation of the due process of law to which the appellant was entitled by the arbitrary and capricious action of the court clerk. We do not establish any ironclad ritual to govern the calling of prospective jurors. We simply hold, under the facts of this case, that where the rules have been agreed upon, either explicitly or implicitly through settled usage, a defendant is entitled to rely upon those rules, unless good cause necessitates some departure therefrom.

> Although the peremptory challenge, to be sure, only entitles a defendant to reject jurors and not to select others, there is at least some element of indirect selection inexorably at work in the very process of elimination. The right to reject need not be exercised in the dark, but is, under circumstances such as those here available, a right of informed and comparative rejection. When the appellant determined to spend his last three peremptories to challenge the first three of the next four persons whom he rightfully expected to be called, he was deciding that he liked the first three less than he liked the fourth. Had he known that he was comparing the three persons challenged with some other fourth person further down the list, he might well have preferred one, or more, of the rejected threesome to the unanticipated fourth. He was thus affirmatively misled in his three decisions to reject.

> We hold that the arbitrary and unexplained action of the clerk in this case impaired the right of the appellant to the use of his peremptory challenges, free from manipulative countermeasures.

*Id.* at 208, 314 A.2d 727.

In *Booze v. State*, 347 Md. 51, 698 A.2d 1087 (1997), in the context of a comparative rejection case, the Court of Appeals reviewed the history of jury selection in Maryland. The Court explained that the early view of peremptory challenges, "[b]ased largely on English precedent, the views of Justice Story announced in *U.S. v. Marchant*, 25 U.S. 480, 12 Wheat. 480, 6 L.Ed. 700 (1827), and practice in Maryland and in other American States," was that "the defendant's right of peremptory challenge is 'not a right to select the jurors, but simply to reject such as he may consider objectionable.'" *Booze, supra*, 347 Md. at 62, 698 A.2d 1087 (citing *Turpin v. State*, 55 Md. 462 (1881), superseded by statute as stated in *Brown v. State*, 359 Md. 180, 753 A.2d 84 (2000)). The *Booze* Court explained that the 1984 revisions to the rule regarding jury selection

> communicate clearly this Court's intent that, to the extent possible, the parties should have before them the entire pool of prospective jurors before being required to exercise any of their peremptory challenges. That intent is not, in any sense, inconsistent with the basic notion that the function of peremptory challenges is to *reject* rather than to select jurors. It simply manifests the belief that the parties should have the right to exercise their rejections intelligently and strategically, and that they can better do that if they have the full panel of prospective jurors before them. This is not necessarily a matter of due process. By adopting Rule 4–312(g), we have made that intent a mandate of State judicial policy, and, in the absence of a waiver or other compelling circumstance, we insist that it be followed. In this case, it was not followed, and there was neither a waiver nor any justification for the deviation.

*Id.* at 69, 698 A.2d 1087.

The present case is different from *Spencer* and *Booze* in a significant way. In the present case, the trial court stated

the order that the jurors would be selected *before* the parties had used any peremptory challenges. The court announced the rules at the outset; it did not change the rules as the game proceeded. Unlike Spencer and Booze, appellant was able to consider the entire venire before exercising his challenges. Indeed, the *Spencer* Court rejected the opportunity to establish "any ironclad ritual to govern the calling of prospective jurors." *Spencer, supra,* 20 Md.App. at 208, 314 A.2d 727. Appellant argued to the trial court that, by not starting the calling of the venire from number one, he was deprived of the possibility of having Reverend Copeland as a juror. But, as we have seen, a defendant's right to exercise peremptory challenges is reserved for the opportunity to reject a prospective juror whom he or she does not want. It is not the right to select a particular potential juror.

*Pollitt v. State,* 344 Md. 318, 686 A.2d 629 (1996), is likewise not helpful to appellant. In Pollitt's trial, immediately after the jury was seated and sworn, the trial court excused one juror when it discovered that she had difficulty hearing. The parties agreed that the court would select a replacement from the remaining venirepersons, who were still in the courtroom. Defense counsel, however, contended that the replacement juror was an alternate, claimed the right to an additional peremptory challenge. The trial court denied the request for an additional challenge.

The Court of Appeals reversed Pollitt's conviction because "defense counsel's consent to the impanelling of the next person on the jury list was based on the reasonable belief that he would receive another peremptory challenge and the court would not grant one, there was, in effect, no consent at all." *Id.* at 326, 686 A.2d 629. That scenario, of course, is inapposite to the facts before us; here, appellant complains of a ruling that was made before the jury was seated and sworn.

It is fundamental that the action of the trial court is presumed to have been correct. The burden of rebutting that presumption is on the party claiming error, first, to allege error, and then to persuade us that an error occurred. *State v. Chaney,* 375 Md. 168, 183–84, 825 A.2d 452 (2003) (citing

*Fisher v. State,* 128 Md.App. 79, 104–05, 736 A.2d 1125 (1999)). "[E]rror is never presumed by a reviewing court, and we shall not draw negative inferences from this silent record." *Chaney, supra,* 375 Md. at 184, 825 A.2d 452.

In the present case, appellant did not object to the order in which jurors were seated, but stated only that he wanted juror number six on his panel. He does not allege in this Court that it was unusual or irregular for the trial judge to have started at a juror other than juror number one;[3] he does not allege that the jury ultimately selected was in any way improper; nor did he allege that the trial court acted with the intent of preventing juror number six from serving on the panel. Absent any allegation that the trial court had a discriminatory or improper reason for starting the selection as it did, or that any prejudice resulted from that procedure, we see no abuse of discretion.

Finally, we point out that after the jury was selected counsel agreed, saying "[w]e're satisfied, your Honor." "We have repeatedly held that a claim of error in the inclusion or exclusion of a prospective juror is ordinarily abandoned when the defendant or his counsel indicates satisfaction with the jury at the conclusion of the jury selection process." *Mills v. State,* 310 Md. 33, 527 A.2d 3 (1987).

## II.—Jurors' Request to View the Videotape

■ Later, during their deliberations, the jury sent a note requesting to see the videotape that had been admitted as Exhibit 2.[4]

The following occurred:

---

3. In those jurisdictions where the jury term continues for a number of weeks or months, and the same venire is returned time after time, it is not uncommon for the court to vary the beginning point of the calling of jurors for selection. To always begin at number one would result in the same jurors being seated frequently, to the probable exception of those at the end of the list. We find no prohibition of that practice, either in Rule 4–312 or case law.

4. We recall Drewer's testimony that the transaction was not captured on videotape because appellant did not approach the driver's side of the

THE COURT: Mr. [Bailiff], you say you have a note.

[THE BAILIFF]: They want to see the video.

THE COURT: No.

[DEFENSE COUNSEL]: No?

THE COURT: No.

[DEFENSE COUNSEL]: Your Honor, if the video is part of the evidence—

THE COURT: That's right.

[DEFENSE COUNSEL]: You didn't want to let them look at it again?

THE COURT: You want them to take all the witnesses in there and hear from them again? What's the difference?

\* \* \*

Tell them they will have to recall or you can bring them in and I'll tell them.

[THE BAILIFF]: Bring them out?

[DEFENSE COUNSEL]: Your Honor, that's like saying you can't look at a document again. It's been admitted.

THE COURT: It's singling out testimony, [Ms. Defense Counsel].

(Whereupon the jury returned to the courtroom.)

THE COURT: [Mr. Foreman], what was the question?

[JUROR]: If we could view the tape again?

THE COURT: You'll just have to recall—

[JUROR]: Okay.

THE COURT:—what you saw.

[JUROR]: Okay, that's fine.

THE COURT: I can't single out any testimony. Then I'd have to let each witness come in.

[JUROR]: Oh, I see. Okay.

\* \* \*

---

van, where the camera was mounted. We assume, therefore, that it was the audio portion of the tape that was played for the jury, and which the jury asked for during deliberations.

THE COURT: You can except to that, if anybody wants to.

[DEFENSE COUNSEL]: Your Honor, I think we both made reference to the video.

THE COURT: I understand you did.

Yes, ma'am. Okay.

Take an exception then.

[DEFENSE COUNSEL]: Thank you, Your Honor.

Appellant now contends that the trial court erred in not permitting the jury to review the tape.[5] He contends that

> [n]o good cause was found for not letting the jury have the tape; thus, its subsequent request to review the tape was no different from a request to examine any other exhibit. The exhibit was not testimony and therefore the trial court erred in treating it as testimony.

Appellant further states: "In relying on an incorrect rule, the court necessarily exercised no discretion."

The State responds that the conduct of a criminal trial, including decisions relevant to the appropriateness of responses to questions by the jurors during their deliberations, is committed to the sound discretion of the trial court.

Maryland Rule 4–326 provides, in pertinent part:

> **(b) Items Taken to Jury Room.** Sworn jurors may take their notes with them when they retire for deliberation. Unless the court for good cause orders otherwise, the jury may also take the charging document and exhibits that have been admitted in evidence, except that a deposition may not be taken into the jury room without the agreement of all parties and the consent of the court. Electronically recorded instructions or oral instructions reduced to writing may be taken into the jury room only with the permission of the court. On request of a party or on the court's own initiative, the charging documents shall reflect only those charges

---

5. Defense counsel did not articulate a precise exception to the court's denial of the jury's request. However, the colloquy indicated that counsel did wish the tape to be provided.

on which the jury is to deliberate. The court may impose safeguards for the preservation of the exhibits and the safety of the jury.

**(c) Jury Request to Review Evidence.** The court, after notice to the parties, may make available to the jury testimony or other evidence requested by it. In order that undue prominence not be given to the evidence requested, the court may also make available additional evidence relating to the same factual issue.

This Court discussed the discretionary nature of items taken into the jury room in *Jackson v. State*, 164 Md.App. 679, 884 A.2d 694 (2005). In that case, the jury asked to hear the testimony of a witness again. The trial court refused the request because the court reporter would have had to transcribe the testimony, which the trial court believed would take too long. Jackson claimed that the trial court "had 'the discretion to have the court reporter read [the] requested trial testimony to the jury.'" *Id.* at 725, 884 A.2d 694 (citing *Veney v. State*, 251 Md. 159, 173, 246 A.2d 608 (1968)). The *Jackson* Court iterated the discretionary nature of the trial court's decision not to allow the jury to hear the witness's testimony again, and the deference to which the trial court's determination is entitled:

> Appellate courts are highly deferential to a trial judge's discretionary determinations. Even in cases in which the appellate court might have deemed it wiser or fairer to have ruled otherwise, it will not presume to substitute its judgment for that of the trial court except in the rare case in which the trial judge has literally abused his discretion. To rule differently than the appellate court might have ruled is not, *ipso facto*, such abuse.

*Jackson, supra*, 164 Md.App. at 725–26, 884 A.2d 694.

The question presented here is similar to that in *Wright v. State*, 72 Md.App. 215, 528 A.2d 498 (1987), in which the trial court had refused to permit a videotape to be taken into the jury room during deliberations. The tape in that case showed "several different line-up sessions," of which one session was

pertinent to Wright's case. *Id.* at 218, 528 A.2d 498. The trial court reasoned that "to allow the jury to view the tape again and again would unduly emphasize that evidence." *Id.* This Court perceived no error:

> [Wright] relies on the provision in Md. Rule 4–326(a) (which says, among other things) that "[U]nless the court for good cause shown orders otherwise, the jury may also take . . . exhibits which have been admitted into evidence . . ." into the jury room. As we see it, the "good cause" mentioned in that rule encompasses the reasons articulated by the trial court. We are not persuaded that the trial court was clearly wrong.

*Id.*

What constitutes "good cause" is a matter entrusted to the discretion of the trial court. *See State v. Price*, 385 Md. 261, 276–77, 868 A.2d 252 (2005) (dealing with good cause for a postponement of trial); *State v. Brown*, 355 Md. 89, 98, 733 A.2d 1044 (1999)(same); *Johnson v. State*, 348 Md. 337, 345–56, 703 A.2d 1267 (1998) (whether to permit filing of a belated insanity plea). "The trial judge's determination is entitled to the utmost respect and should not be overturned unless there was a clear abuse of that discretion." *Johnson, supra,* 348 Md. at 346, 703 A.2d 1267 (quoting *Grandison v. State*, 305 Md. 685, 711, 506 A.2d 580 (1986)) (citing *Madore v. Baltimore County*, 34 Md.App. 340, 346, 367 A.2d 54 (1976)). *See also State v. Frazier*, 298 Md. 422, 451, 470 A.2d 1269 (1984)(trial court's discretionary determination will not be set aside on appeal unless the exercise of discretion was arbitrary).

In the instant case, the trial court made a discretionary determination that allowing the jury to have the videotape of the alleged incident would overemphasize it. As in *Wright*, we are not persuaded that the trial court abused its discretion in making that determination.

*Morris v. State*, 59 Md.App. 659, 477 A.2d 1206 (1984), does not persuade us otherwise. The trial court refused a jury request to hear a tape recording because the tape had not been admitted into evidence. Defense counsel had requested

that the recording be admitted, but the State objected, giving assurance that it would seek to admit it during the testimony of its next witness. *Id.* at 673–74, 477 A.2d 1206. But, the tape was never admitted as an exhibit. In their closing arguments, both defense counsel and the State referred to the recording, and argued its significance. The court declined to give the tape to the jury, because it had not been admitted. *Id.* at 674–75, 679–80, 477 A.2d 1206. On appeal, this Court stated that "based on the use of the tape made both during the trial and the closing arguments it was *de facto* already admitted into evidence." *Id.* at 679–80, 477 A.2d 1206.

Here, the trial court articulated an acceptable reason for refusing the jury's request. We perceive no abuse of discretion.

### III.—Motion to Quash

■ Before trial, defense counsel issued a subpoena *duces tecum* to Officer Drewer, requiring him to personally appear at appellant's trial and produce:

> Records of all drug or non-CDS transactions on 9/21/05 made by you between the beginning of your undercover assignment on that date until your shift ended, including narratives and drug transmittal sheets to the lab for chemical analysis, envelopes used to temporarily transport the suspected drugs to the station before they were sealed. Any videotape of the alleged transaction in this case.

The State moved to quash alleging, *inter alia,* that "any such documents in the custody of the Salisbury City Police Department are not discoverable under the Maryland Rules and compliance with the Writ of Subpoena would circumvent the Rules of Procedure"; that "Officer [Howard Drewer] is not the proper person designated by the Salisbury City Police Department to maintain their records and reports"; and that "Compliance with this Writ of Subpoena would impose annoyance, oppression and undue burden on Officer [Howard Drewer]."

The trial court convened a hearing on the State's Motion to Quash, at which appellant's counsel argued that she needed the information to effectively cross-examine Drewer. Counsel proffered a transcript of a prior trial, involving a different defendant, in which Drewer had testified that he did not seal the little envelopes in which he placed the suspected drugs before putting them into the bigger envelope. Based on that information, defense counsel argued that there was a "potential for chain of custody problems, even problems that something that was a drug from one person might get into another envelope or the wrong person's name may end up on a transmittal sheet for drugs that really were somebody else's."

In response to the trial court's question, defense counsel pointed out that she was entitled to the officer's notes before she cross-examined him, and that she thought "the Court would rather have him turn those notes over prior to a trial than to have a jury trial stopped for him to provide [her] with documents for [her] to go out and spend however long it takes to do an adequate job to be able to develop cross-examination." Defense counsel also pointed out that "officers' notes are discoverable through *Brady*."[6]

The State argued that the information was irrelevant to appellant's case, that complying with the subpoena would be burdensome for the State, and that Drewer was not the appropriate person from whom to subpoena the records. The State acknowledged that, for the day in question, there was only one other "bust," but conceded that in other cases there could be many more.

The trial court granted in part, and denied in part, the State's Motion to Quash, stating:

Well, I'm not sure you have case law authority supporting your position Ms. [Defense Counsel], as far as the officer's notes pertaining to other transactions involving other possible suspects or Defendants, unless you can cite me a case.

---

6. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

In this appeal, appellant asserts that "in a fast moving, surreptitious transaction[, the] chance of misidentifying the seller or the drugs is substantial," and that the trial court's refusal to allow him the information he sought was error.

The State counters that the records were not relevant to appellant's misidentification defense. It also asserts that "[p]roduction of these records was also potentially burdensome for the State." It asserts that the information is not discoverable under Md. Rule 4–263, and that appellant has not claimed that the evidence was exculpatory *Brady* material.

Finally, the State asserts that any error was harmless.

### Standard of Review

"Discovery questions generally 'involve a very broad discretion that is to be exercised by the trial courts. Their determinations will be disturbed on appellate review only if there is an abuse of discretion.' " *Cole v. State*, 378 Md. 42, 55, 835 A.2d 600 (2003) (*citation omitted*). "The application of the Maryland Rules, however, to a particular situation is a question of law, and 'we exercise independent de novo review to determine whether a discovery violation occurred.' " *Id.* at 56, 835 A.2d 600 (citation omitted).

### Discovery Rules

Maryland Rule 4–263 governs pre-trial discovery in circuit court. Aside from exculpatory information, the State must disclose: (1) the names and address of each witness then known whom the State intends to call to prove its case-in-chief or to rebut alibi testimony; (2) statements of the defendant to a State agent that the State intends to use; (3) statements of co-defendants made to State agents that the State intends to use; (4) reports or statements of experts consulted by the State.

In addition, the State must make available for the defendant to inspect, copy, and photograph (1) any documents, computer-generated evidence, recordings or other tangible things that the State intends to use at a hearing or trial; and

(2) any item obtained from, or belonging to, the defendant whether or not the State intends to use it at the hearing or trial. Md. Rule 4–263(b). At trial, however, defense counsel is entitled to see notes or reports of a State's witness in order to assist counsel in cross-examining the witness. *Carr v. State,* 284 Md. 455, 472–73, 397 A.2d 606 (1979); *Massey v. State,* 173 Md.App. 94, 115, 917 A.2d 1175 (2007); *Leonard v. State,* 46 Md.App. 631, 638, 421 A.2d 85 (1980).

In *Massey,* this Court pointed out the need for such statements at trial:

When confronted with the actual testimony of a critical witness and the knowledge that the witness has given a prior statement bearing on a material issue in the case, counsel is not engaged in a mere "fishing expedition" in seeking access to the prior statement. At that point, it becomes more than a matter of casting a seine over the State's files to see what turns up, but of directly confronting the witness; and the statement thus assumes a specific importance and relevance beyond its general value for trial preparation.

*Massey,* 173 Md.App. at 115, 917 A.2d 1175.

 Both the State and the trial court apparently believed that because the information sought by the subpoena involved other cases, it was not relevant.

The word "relevance" has a different meaning in the discovery context from its meaning in the trial context. The issue at trial is admissibility of offered evidence, while the issue in pre-trial stages is whether a party may obtain information or documents through discovery. This distinction is made clearest in the civil setting. "A party may obtain discovery regarding any matter, not privileged, ... if the matter sought is relevant to the subject matter involved in the action." Rule 2–402(a). A party may not object to a discovery request on the ground that "the information will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence."

*Cole v. State,* 378 Md. 42, 61, 835 A.2d 600 (2003) (quoting Md. Rule 2–402(a)) (internal footnote omitted).

 Information is not irrelevant solely because it involves other cases. *Blades v. Woods,* 107 Md.App. 178, 183–84, 667 A.2d 917 (1995). Further, "[g]eneral allegations of overbreadth, vagueness, and burden, however, are not sufficient to defeat the requesting party's motion to compel. The complaining party should demonstrate, *e.g.* through an affidavit, why furnishing a particular answer would be burdensome." *Id.*

Here, defense counsel asked for the records in the hope of obtaining information with which to cross-examine Drewer regarding his handling of the various pieces of contraband he might have seized during his shift on that date, and whether it affected the substance the officer allegedly bought from appellant.

That said, however, and whether the information could or should have been disclosed by the State in discovery, appellant has not told us how he was prejudiced by the trial court's refusal to allow defense counsel the information she sought. Although the notes and records sought by the subpoena were not provided, defense counsel was not in any fashion encumbered in her cross-examination of Drewer. She elicited from Drewer at trial that he put the suspected drugs into a small manila envelope, "maybe an inch and a half by three" and that he closed the flaps of the envelopes, but did not seal them.

Defense counsel was permitted to ask Drewer whether he had any suspected substances in other small envelopes inside the larger envelope. Drewer reported that he made one other buy on that date, although he did not recall whether he made a purchase prior to, or after, his purchase from appellant. In addition, Drewer testified about how he maintained the substances he seized, and the chain of custody of the items. He also testified about the description he gave to the officers who detained appellant, and conceded that he had not recorded the seller's height, weight, build, age, hair color, or complexion.

Defense counsel explained at the hearing that she wanted the information to be able to cross-examine Drewer without taking a lot of time to review the information. Appellant has not identified anything that defense counsel was not able to ask, nor has he alleged that the trial court refused to give defense counsel sufficient time at trial to review the information. Without determining whether the trial court abused its discretion in quashing the subpoena, we conclude that appellant suffered no prejudice from not having the information before trial.

**JUDGMENTS OF THE CIRCUIT COURT FOR WICOMICO COUNTY AFFIRMED; COSTS ASSESSED TO APPELLANT.**